Commonwealth *v.* Wheeler, Appellant.

286

Argued December 12, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WATKINS, MONTGOMERY, and FLOOD, JJ. (WOODSIDE, J., absent).

*A. R. Cingolani, Jr.,* with him *A. R. Cingolani,* and *Cingolani & Cingolani,* for appellant.

*Frederic G. Antoun,* Deputy Attorney General, with him *David Stahl,* Attorney General, for Commonwealth, appellee.

OPINION BY RHODES, P. J., March 19, 1963:

These sixty appeals[1] are by Mae H. Wheeler from convictions and sentences on indictments for embezzlement and forgery. Defendant was convicted on fifty-five indictments charging embezzlement and five indictments for forgery and uttering and publishing a forged instrument.[2]

---

[1] Included in the 60 appeals are 5 convictions of forgery (appeals Nos. 10 and 48 to 51, inclusive, April Term, 1963), and 55 convictions of embezzlement (appeals Nos. 52 to 106, inclusive, April Term, 1963). Included in the embezzlement convictions are 42 convictions involving the installment share account (appeals Nos. 52 to 92, inclusive, and 103, April Term, 1963) ; 7 convictions involving the loan in process account (appeals Nos. 93 to 96, inclusive, and 104 to 106, inclusive, April Term, 1963) ; 2 convictions involving the full-paid stock account (appeals Nos. 97 to 102, inclusive, April Term, 1963) ; 2 convictions involving the mortgage account (appeals Nos. 100 and 101, April Term, 1963) ; and 2 convictions involving the optional share account (appeals Nos. 98 and 99, April Term, 1963).

[2] Defendant was sentenced on the indictments as follows:

(1) Forgery (Nos. 106 and 108, September Term, 1961)—committed to the State Correctional Institution at Muncy and restitution to be made, these sentences to run concurrently; (2) Embezzlement (Nos. 123, 161, 162, 166, 168, September Term, 1961)—committed to the State Correctional Institution at Muncy and restitution to be made, sentences to run concurrently but not to begin

The issues raised by defendant in her motions for a new trial and in arrest of judgment were: (1) whether there was error in refusing defendant's motion for continuance; (2) whether there was error in severing the indictments; (3) whether there was error in refusing to quash the indictments involving embezzlement; (4) whether there was error in refusing to sustain defendant's demurrer to the sufficiency of the evidence; (5) whether the jury verdict was contrary to the evidence; and (6) whether a deputy attorney general had the right to present the indictments to the grand jury and conduct the case at trial. The court below refused defendant's motions for a new trial and in arrest of judgment. The same questions are now presented to this Court on appeal.

The crimes for which defendant was convicted arose while she was the secretary-treasurer and a board member of the Workingmens Building and Loan Association of Butler. In the audit for 1959 a discrepancy of approximately $2,000 was discovered in the installment share account. This was noted on the audit with the request that the discrepancy be accounted for prior to the next audit. During the course of the audit for 1960 the discrepancy rose to approximately $19,000. At this point, in January, 1961, the auditors met with the Board of Directors and suggested that a complete and thorough audit of the installment share account be

until sentences in Nos. 106 and 108, September Term, 1961, have been served; (3) Embezzlement (Nos. 116 to 122, inclusive, Nos. 124 to 160, inclusive, Nos. 163 to 165, inclusive, Nos. 167, 169, 170, September Term, 1961)—sentences suspended and defendant placed on probation for five years providing she pay the costs, make restitution, and be of good behavior; (4) Forgery (Nos. 107, 109, 110, September Term, 1961)—sentences suspended and defendant placed on probation for five years providing she pay the costs, make restitution, and be of good behavior. See Act of June 22, 1931, P. L. 859, §1, 61 PS §566.

made. The board agreed to a special audit. Because the association was due for a routine examination, the Department of Banking joined with the auditors to conduct the special audit and a routine examination. The association auditors sought and were granted permission to conduct the audit without the presence of defendant who was asked to take a leave of absence. The audit began on February 9, 1961. On March 1, 1961, the District Attorney of Butler County, on information filed by Fred A. Fahrner, an examiner of the Department of Banking, presented before an alderman an information charging defendant with falsification of the records. In April, 1962, the District Attorney of Butler County informed the Attorney General by letter that, because of his personal relationship with the association and defendant, he felt that he could not continue, and asked the Attorney General to enter the case. The Attorney General agreed and assigned Deputy Attorney General Frederic G. Antoun to the case. The audit and examination continued, and on June 6, 1961, one hundred seventeen additional informations charging defendant with a variety of offenses were filed at the same alderman's office. After a lengthy preliminary hearing extending from June 26, 1961, to June 29, 1961, including evening sessions, all of the informations were returned to court. On September 15, 1961, the Butler County Grand Jury returned true bills on one hundred seventeen indictments. The trial was set for September 25, 1961, with Honorable MORGAN H. SOHN of the 36th Judicial District specially presiding.

On the day of trial defendant moved for a continuance. After lengthy argument, both in open court and in chambers, the motion for continuance was refused. The Commonwealth requested a severance of the charges. This request was granted and the trial was directed to start on September 26, 1961, on indictments

Nos. 116 to 170, inclusive, September Term, 1961,[3] involving embezzlement, and indictments Nos. 106 to 110, inclusive, September Term, 1961,[4] involving forgery. Before a jury was selected, defendant moved to quash all the indictments and challenged the right of Mr. Antoun to have presented the indictments to the grand jury and to his further participation in the case. The motion was overruled. On October 18, 1961, the jury returned verdicts of guilty on all indictments. Motions for new trial and in arrest of judgment were made by defendant and refused.

## Motion for Continuance

An application for a continuance is addressed to the sound discretion of the trial judge, and in the absence of an abuse of discretion the action thereon will not be disturbed. *Com. v. Meszaros,* 194 Pa. Superior Ct. 462, 463, 168 A. 2d 781; *Com. v. Richardson,* 392 Pa. 528, 540, 140 A. 2d 828. A careful review of the facts discloses that defendant and her counsel, who represented her from the beginning of the proceedings, had sufficient time to prepare for the trial.

The special audit by the association auditors, joined in by the Department of Banking, began on February 9, 1961. By March 1, 1961, defendant had the first formal notice that she was being charged with a crime when the false entry charge was filed and she posted bail. By June 6, 1961, defendant was formally charged by the filing of the additional one hundred seventeen informations, and she was afforded a preliminary hearing which extended from June 26 to June 29, 1961, including evening sessions.

---

[3] Appeals Nos. 52 to 106, inclusive, April Term, 1963.
[4] Appeals Nos. 10 and 48 to 51, inclusive, April Term, 1963.

Over two hundred days elapsed between the day the auditors appeared and began the special audit and the day the motion for continuance was presented. At a conference during the week of September 4, 1961, it was agreed that defendant, her counsel, and her auditors have access to all records of the association. A condition of this agreement, imposed by the association, was that a representative of the Commonwealth be present. In that event defendant was asked to pay daily compensation to such representative. In any event, however, the Commonwealth offered to make its audit findings and surveys available to defendant or permit photostatic copies to be made if defendant paid the cost. During the course of the trial the Commonwealth offered to produce any information requested by defendant.

Between February 9, 1961, when the auditors began working, and February 13, 1961, the date defendant was requested to take a leave of absence, certain vital records disappeared.

We feel that, under the circumstances, defendant and her counsel had adequate opportunity to secure the necessary evidence to prepare her defense. She was thoroughly familiar with the records and was the one person who directed every operation of the association. Because of her knowledge of the working of the association, she knew what records she would need to prepare her case. She made no specific requests for any document. The record indicates that she would have received the full co-operation of the Commonwealth and the auditors. Her case was competently presented to the jury by her capable counsel. The court below did not abuse its discretion in refusing the continuance.

## Severance of Indictments

The consolidation or separation of indictments is a matter for the trial judge whose determination will be

reversed on appeal only for obvious abuse of discretion or prejudice to the defendant. *Com. ex rel. Lockhart v. Myers,* 193 Pa. Superior Ct. 531, 539, 165 A. 2d 400.

Defendant argues that she has a defense to either all or none of the indictments, and that, since these indictments dealt with transactions from January 1, 1960, to February 13, 1961, there was a complete elimination of the opportunity of cross-examination or inquiry into other phases of the association transactions which were essential to her defense.

The Commonwealth's basis for the severance was that it would be less complicated for the jury.

A review of the facts discloses that the indictments presented for trial involved the fifty-five charges of embezzlement and the five charges of forgery. The remaining charges concern the falsification of the records of the association by material omissions therefrom when presented to the auditors for examination, and the false entries in the nature of fictitious loan transactions placed upon the accounts of individuals dealing with the association.

We believe that defendant was not prejudiced by the severance of the indictments. The charges submitted to the jury logically fitted into a general pattern. The record consists of more than 1,200 pages. To have submitted another type of alleged offense to the jury might well have resulted in confusion. There is no merit to defendant's argument that she was limited in her defense. Questions which were limited in cross-examination of prosecution witnesses could have been asked these same witnesses when defendant presented her case. Subpoenas were issued by defendant for several of the prosecution witnesses, but she did not call them to testify, even as hostile witnesses, to the matters pertaining to her defense. Her failure to do so is a matter that only she can explain. We are therefore convinced that the action of the court below

in granting the Commonwealth's motion for severance was proper.

## Motion to Quash Indictments for Embezzlement

The embezzlement indictments read: ". . . being a director, secretary-treasurer, managing officer and employee of the Workingmens Building and Loan Association of Butler, Pennsylvania, wilfully, knowingly and feloniously did embezzle, abstract and wilfully misapply moneys, funds or credits of the said Workingmens Building and Loan Association of Butler, Pennsylvania, and did make a false entry or entries in a book, report or statement of the said Workingmens Building and Loan Association of Butler, Pennsylvania, with intent in either case to injure or defraud the said Workingmens Building and Loan Association of Butler, Pennsylvania, and with intent to injure and defraud [name of person dealing with the association] and others of the sum of [amount of money] being the money and property of the said Building and Loan Association, having been paid therein by [name of person], account number [number of account with the association]."

After the selection of the jury but prior to the swearing thereof, defendant moved to quash all the indictments charging embezzlement for the reason that each indictment failed to disclose the nature and detail of the alleged false entry. The Commonwealth stated that the only reason the false entry appears in the indictment is because the statute so reads; that, under these indictments, proof of a false entry would not be attempted except possibly in rebuttal; and that other indictments, which were not as yet presented for trial, describe the false entry. Defendant's motion to quash the indictments was refused. Defendant then moved for a bill of particulars in each instance where

the embezzlement was attempted to be shown by means of any false entry. This motion was denied when the Commonwealth agreed to make all of its records available concerning those charges. Defendant now claims that the testimony of Mr. Fahrner had direct bearing on alleged false entries under the guise of "tracing" payments in and out of all the accounts mentioned in the various indictments.

The Act of March 31, 1860, P. L. 427, §11, 19 PS §261, provides: "Every indictment shall be deemed and adjudged sufficient and good in law which charges the crime substantially in the language of the act of the assembly prohibiting the crime, and prescribing the punishment, if any such there be, or if at common law, so plainly that the nature of the offense charged may be easily understood by the jury."

The indictments contain the relevant parts of the Act of June 24, 1939, P. L. 872, §829, 18 PS §4829, as they pertain to the crime of embezzlement. Defendant's testimony also indicates that she had knowledge of the indictments charged to her. The words in the indictments pertaining to false entry are therefore surplusage, and, if eliminated, the validity of the indictments upon which defendant was found guilty of embezzlement is not affected. *Com. v. Bristow,* 185 Pa. Superior Ct. 448, 459, 138 A. 2d 156; *Com. v. Weldon,* 159 Pa. Superior Ct. 447, 451, 48 A. 2d 98. Our statement in *Com. v. Buford,* 179 Pa. Superior Ct. 312, 315, 116 A. 2d 759, 760, is pertinent: "Our conclusion is that the language in question was sufficient to inform appellant of the charge which he was called upon to answer and to protect him against a second conviction for the same offense. See Commonwealth v. Campbell, 116 Pa. Superior Ct. 180, 176 A. 246. In passing upon the sufficiency of criminal pleadings, courts look more to substantial justice than to technicalities: Commonwealth v. Romesburg, 91 Pa. Superior Ct. 559. Over

nice exceptions are not to be encouraged, especially in non-capital cases: Commonwealth v. Batch, 120 Pa. Superior Ct. 592, 183 A. 108. Specifications of the evidence to be adduced need not be shown: Commonwealth v. Wilcox, 112 Pa. Superior Ct. 240, 170 A. 455, affirmed 316 Pa. 129, 173 A. 653.''

We are of the opinion that the indictments charging embezzlement were not defective. The question of tracing, which arose in the course of the trial, was simply proof that defendant placed the funds received to the credit of, or in the account of, an individual other than the individual who paid the money into the association. This was related to the proof of embezzlement. The court below did not err in refusing to quash the indictments.

## Demurrer to Evidence

At the conclusion of the Commonwealth's case, a demurrer to the sufficiency of the Commonwealth's evidence was made and refused. The proper test to apply in determining the validity of a demurrer is whether the evidence of record and the inferences reasonably drawn therefrom would support a verdict of guilty. *Com. v. Gomori*, 192 Pa. Superior Ct. 325, 329, 161 A. 2d 649.

Defendant argues on the charges of embezzlement that the most the Commonwealth proved was a maladministration by defendant of the affairs of the association. She maintains that there was no direct proof of any abstraction of funds, and that the Commonwealth did not prove the willful misapplication because (a) there was no proof of the use and benefit of the funds by defendant for herself or some other person or persons other than the association, or (b) there was no proof that the acts were done with the intent to injure or defraud.

Embezzlement by abstraction and willful misapplication has been defined in *Com. v. Dauphinee*, 121 Pa. Superior Ct. 565, 578, 183 A. 807, 813, as follows: "Willful misapplication, as the term is there used, means a misapplication made knowingly and designedly by an officer of a bank for his own use and benefit, or that of some person or persons other than the bank, and with intent to injure or defraud it. Criminality of some sort is implied by the use of the word and must be shown in order to sustain a conviction. It is not necessary to show that the funds were ever in the actual possession, control or custody, of the accused or that he derived any definite personal benefit from their misapplication. On the other hand, 'embezzlement,' as that word is used in the act, is intended to describe a species of larceny by an officer or employee of a bank and the conversion of funds, lawfully in his custody or control, to his own or another's use, with intent to injure or defraud the bank. Of course the custody or possession need not be exclusive, but the crime of embezzlement involves two general elements—a breach of trust or duty in respect to funds lawfully in a party's control but belonging to another, and the wrongful appropriation thereof to his own use.

"We think 'abstraction' is to be understood in the popular sense of the word and as the act of one who, with intent to injure or defraud a bank, takes or withdraws from it any of its funds and converts them to his own or another's use. Previous lawful custody is not a technical element in either abstraction or misapplication. Although embezzlement includes both abstraction and misapplication, either of the latter offenses may be committed without committing the technical offense of embezzlement; and while abstraction includes misapplication the latter offense is more com-

prehensive than the former, since in abstraction a taking or withdrawing must be shown."[5]

The Commonwealth by its evidence established the following: Early in 1937 defendant was employed by the secretary of the Workingmens Building and Loan Association as a clerk to assist him. About 1940 she was named assistant secretary, and in 1944 or 1945, at the death of the secretary, she became a director of the association and assumed the position of secretary. Upon the death of the treasurer, defendant was appointed secretary-treasurer and continued in this position until February 13, 1961.

In those transactions involving the installment share accounts the evidence was that defendant had complete control over the subsidiary ledger for the accounts since the beginning of 1960. Whenever a customer made a payment to this account, the teller would mark the customer's book, record the account number and amount on a daily slip, and turn the slip and money over to defendant. Of these forty-two installment share accounts only two subsidiary ledger sheets could be found. However, not all of the receipts and payments in these two accounts were recorded on the subsidiary ledger. None of the installment share account daily slips for 1960 could be located.

The charges here were embezzlement by abstraction or by misapplication. The Commonwealth produced

---

[5] As we pointed out in *Com. v. Dauphinee*, 121 Pa. Superior Ct. 565, 579, 183 A. 807, the words "willfully misapplied" also appear in the federal statutes, and therefore federal decisions are relevant and of a definite aid in interpreting the meaning of these words. On this point, see the following: *United States v. Britton*, 107 U.S. 655, 668, 2 S. Ct. 512, 27 L. Ed. 520; *United States v. Northway*, 120 U.S. 327, 7 S. Ct. 580, 30 L. Ed. 664; *United States v. Heinze*, 218 U.S. 532, 31 S. Ct. 98, 54 L. Ed. 1139; *Mulloney v. United States*, 79 F. 2d 566; *United States v. Matsinger*, 191 F. 2d 1014; *United States v. Nystrom*, 237 F. 2d 218; 18 U.S.C.A. §656.

the books and records of the association which indicated that the funds received on the forty-two accounts were not credited to the depositors on the association records, but, in most instances, were credited to the accounts of other individuals.

In appeal No. 98, April Term, 1963, the Commonwealth established the delivery of a check endorsed in blank to defendant in payment for optional shares to the value of $2,000 in the association. The check was cashed at the Butler Savings and Trust Company and never went through the records of the association. The charge here is embezzlement by abstraction.

As to the seven indictments involving the loan in process account, in which cash was paid, the records of the association and the bank deposit slips of the association indicated that the cash was not deposited in the loan in process account. In each instance the cash was paid to defendant, and in each instance there was no credit on the ledger sheet of the individual for the amount of money paid. The charges here are embezzlement by abstraction.

In appeal No. 97, April Term, 1963, which involves the $20,000 check given by Ruth G. Miller in payment for full-paid shares, the evidence indicated that the money was paid to defendant who gave a receipt and a certificate. No credit was given to Mrs. Miller on the books. The charge here is embezzlement by willful misapplication.

In appeal No. 102, April Term, 1963, the Commonwealth established that defendant received $2,000 in cash from Ruth E. Haug, issued a full-paid share certificate to Mrs. Haug, and marked the stub "void" for the Haug certificate. A record of the $2,000 could not be found on the association books. The charge here is embezzlement by willful misapplication.

Defendant in effect seeks to have this Court rule that a person is merely guilty of maladministration

unless it is proved that she was seen putting the money into her pocket or in some way secreting the same, or unless there was some proof of personal expenditures in excess of income. The evidence of misapplication was clear. In certain instances the money paid to defendant never was deposited in the association account and the individual making the payment received no credit therefor. In other instances the defendant credited installment share payments to the mortgage share accounts of other individuals. See *Com. v. Lewis, Munn and Hibbert,* 114 Pa. Superior Ct. 335, 173 A. 473. See, also, *Com. v. Weldon,* supra, 159 Pa. Superior Ct. 447, 450, 48 A. 2d 98. The prejudice and the loss to the association are obvious. The association had to recognize the validity of the payments, some of which it never received and others which were misapplied. Defendant's attempt to belittle the fact that the loss is merely reflected in the reserve of the association is without merit. The depletion of the reserve to honor the obligations was a real and actual loss caused by the misapplication and abstraction of defendant. There was sufficient evidence in those instances involving misapplication or abstraction to warrant a finding by the jury. Nor is there merit to the contention that intent to defraud was not shown. Intent to injure or defraud may be shown or be inferred from the doing of the wrongful, fraudulent, and illegal acts which as a necessary result naturally produce loss or injury to the association. *Com. v. Huster,* 118 Pa. Superior Ct. 24, 30, 178 A. 535; *Com. v. Grant,* 121 Pa. Superior Ct. 399, 412, 183 A. 663.

In the forgery indictments, the Commonwealth produced each individual who testified that the instrument purportedly signed by him did not in fact carry his true signature, and that no note was ever executed by him in favor of the association. In these charges defendant maintains there was no evidence to show she

benefited in any sense or that there was a loss to any of the persons named in the transactions.

We said in *Com. v. Brown*, 96 Pa. Superior Ct. 13, 14, 15: "Forgery is the fraudulent making of any writing to the prejudice of another's right. . . . It is not necessary to establish a loss to the party taking a forged paper in order to indict the maker or utterer of forgery. The fraud need not be successfully perpetrated, nor must someone have suffered thereby. The crime does not exist in the actual perpetration of a fraud. It is sufficient that the false instrument is made with the intent to defraud and that it is of such character that it might prejudice the rights of another accepting it."

This is precisely the case at bar. The intent to defraud can be inferred from the facts and the loss suffered is clear. The forged notes which had been reflected as assets of the association were required to be charged off against the reserve of the association which obviously prejudiced the association.

We agree with the court below that there were sufficient facts presented by the Commonwealth to warrant a finding of guilty by the jury. There was no error in overruling the demurrer.

## Verdict of the Jury

The defendant argues that the verdict of the jury was contrary to the evidence and to the applicable law in the case.

A motion for a new trial on the ground that the verdict is against the weight of the evidence is within the sound discretion of the trial judge. *Com. v. Elliott*, 292 Pa. 16, 24, 140 A. 537.

We stated above that the Commonwealth's evidence alone was sufficient to warrant the finding of guilty. However, the jury had the benefit of defendant's testi-

mony in its deliberations. *Com. v. Gomori,* supra, 192 Pa. Superior Ct. 325, 329, 161 A. 2d 649; *Com. v. Ott,* 154 Pa. Superior Ct. 647, 651, 36 A. 2d 838.

Defendant's testimony is that, at the end of her first year with the association, she noticed the subsidiary ledger did not balance with the general ledger and spoke to the secretary who assured her she made an error. No adjustment was made of this error. In 1938 the books still did not balance. Defendant then changed some footings in the subsidiary ledger. When she became secretary she talked it over with the president, who said, "it will work out." Each year the amount continued to grow. Defendant thought it was because the association was paying five per cent dividends while the true financial picture of the association did not warrant it. After many years, for audit purposes, the defendant began to withhold subsidiary ledger sheets to bring the ledger into balance with the general ledger. Following the audit the sheets would be returned. Defendant stated that if these sheets were not removed the books would not balance and the five per cent dividend could not be paid. Upon replacing the sheets in the ledger, the dividends were credited to the removed sheets. This she claims resulted in more dividends being paid than shown on the dividend report. Payment of these additional dividends left insufficient funds for the reserve account. When defendant could no longer suppress enough subsidiary ledger sheets to account for the unbalanced books, she started to manipulate the share loans.

Defendant admits the forgeries. She stated, in effect, that the Miller, Haug, and loan in process receipt money was used to pay off the installment share accounts.

Defendant did not inform any of the present officers of the unbalanced books because she feared she

would be accused of taking the money.[6]  However, in the beginning, when the initial shortage was noted, defendant offered to pay $19,000.

---

[6] Defendant testified in part as follows:

"A. I continued on, changing perhaps totals in the ledger. I knew it was wrong to do it, but I didn't do it with any feeling that anybody could be hurt, and I was so baffled because I knew the money was all there, and I couldn't figure out why it couldn't work out or wouldn't work out; and as it grew, of course then the doubt grew in my mind, if I went to someone and told them about it, that I would be accused of abstracting cash, which I never have done, from the association. . . . [n.t. 879]

"A. They would have to be changed in the subsidiary ledger The footings would have to be brought down so that the total of the subsidiary ledger would equal the general ledger fund; but at no time was it done with any intent to hurt anyone because, when the stockholder would come in, he would be paid up in full, and I received no personal gain except I was able to get myself into a box that I couldn't even talk about it after several years.

"Q. Now, getting into the fifties, what did you have to do to adjust these accounts so that the dividends could be paid?

"A. By that time, the amount had grown to such an extent, and I couldn't see yet that any stockholder could be hurt because there was a reserve fund—well, they say it is for a specific purpose; the people were getting their money actually in advance on their dividends— they were being paid in advance; but in 1950, it was necessary—sometime in late forties or 1950, I withheld ledger sheets from the subsidiary ledger. . . . [n.t. 885]

"A. In 1954, when finally I was able to convince the Board that we should handle optional shares accounts, we were trying to transfer—I knew I was in trouble then—I had known for some time that there was trouble—I thought perhaps, if we could get all the black books, we could perhaps some way attain a balance and keep at least control on what we were doing, and the last major amount of those books—that is, with any degree of volume— were started in 1954. . . . [n.t. 924]

"A. I have no explanation, Mr. Antoun, why I did these things. I told you I have done them in desperation—panic—in 1960. . . . [n.t. 984]

"A. I have told you that I have done some things that I don't understand why; I have no explanation why." [n.t. 1001]

Defendant contends that she did not take any money; that all money missing is in the reserve account; and that there is enough money in the reserve account to pay everyone. She admits, however, that the reserve account is for all the shareholders and not just the installment shareholders.

We agree with the court below when it said: "The defendant admits acts of wilful misapplication. Intent to defraud became the factual issue, and it was submitted to the jury. As to forgery, defendant admits the act of writing names on a written instrument. The question of fraudulent intent was submitted to the jury."

It is this Court's conclusion that the verdict is supported by the law and the evidence, and that there was therefore no error in refusing defendant's motion for a new trial.[7]

## Arrest of Judgment

Prior to the selection of the jury, counsel for defendant, by a motion to quash, questioned the authority of Frederic G. Antoun, Deputy Attorney General, to present the indictments to the grand jury and his general appearance in the case. The motion was overruled and is again raised in a motion in arrest of judgment.

The record discloses a letter from the District Attorney of Butler County to the Attorney General re-

---

[7] The court in its opinion said: "Briefly the evidence, if believed, indicated as to 42 accounts that money had been paid in; it came into the possession of defendant, and it was not entered on the books of the Association to the credit of the owner. On other indictments the evidence was that money was delivered to defendant and not credited at all to the purpose intended. This was sufficient to require an explanation. In defendant's case the explanation was an admission."

questing that he be superseded in the prosecution of the cases, as well as a letter from the Attorney General complying with the request. The record also indicates that Mr. Antoun is a deputy attorney general and that he appeared in that capacity.

Defendant concedes that the Attorney General has the power to intercede. However, she contends that, since the record, prior to the presentation of the indictments, did not indicate in what manner the Attorney General had entered the case, a deputy attorney general, to appear and conduct the proceedings, should first take the oath of office of district attorney as required by The Administrative Code, Act of April 9, 1929, P. L. 177, Art. IX, §907, 71 PS §297. With this we cannot agree. The Act of 1929 is concerned with special attorneys in criminal cases at the request of the president judge. In that situation any attorney could be appointed and would be required to take an oath of office. However, in this case the district attorney requested that he be superseded. A deputy attorney general was assigned to prepare and sign the indictments and prosecute the case. He appeared as a representative of the Attorney General. His presence was the same as though the Attorney General appeared in person. The assignment was not made under section 907 of the Act of 1929, but rather under the broad powers of the Attorney General's office. *Com. ex rel. Minerd v. Margiotti*, 325 Pa. 17, 29, 34, 188 A. 524. Moreover, a deputy attorney general, when assuming the office of deputy, must take and subscribe to the constitutional oath of office the same as a district attorney and the Attorney General. See Act of April 9, 1929, P. L. 177, Art. II, §218, 71 PS §78; Constitution, Art. VII, §1; Act of May 3, 1850, P. L. 654, §1, 16 PS §9952; Act of April 21, 1857, P. L. 266, §4, 71 PS §813.

We agree with the court below that a deputy attorney general, when delegated by the Attorney General,

may exercise the powers and duties of the Attorney General in a criminal prosecution without again taking the oath of office.

Judgments of sentence are affirmed, and it is ordered that said defendant appear in the court below at such time as she may be there called, and that she be by that court committed until she has complied with her sentences or any part thereof which had not been performed at the time the appeals were made a supersedeas.

WOODSIDE, J., took no part in the consideration or decision of this case.